UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

**SAMUEL COLLINS,**
    **Plaintiff,**

v.     04-2180

**JOHN DOE, et al.,**
    **Defendants.**

### MEMORANDUM OPINION AND ORDER

Before the court are the defendant, IKECHUKWU UZOARU's summary judgment motion [244] and the plaintiff's response [254].

### Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.56(c); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)*; Herman v. National Broadcasting Co., Inc.*, 744 F.2d 604, 607 (7th Cir. 1984), *cert. denied*, 470 U.S. 1028 (1985). In determining whether factual issues exist, the court must view all the evidence in the light most favorable to the non-moving party. *Beraha v. Baxter Health Corp.,* 956 F.2d 1436, 1440 (7th Cir. 1992). Further, this burden can be satisfied by "'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If such a showing is made, the burden shifts to the non-movant to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Outlaw*, 259 F.3d at 837. A nonmoving party cannot rest on its pleadings, but must demonstrate that there is admissible evidence that will support its position. *Tolle v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir. 1994). Credibility questions "defeat summary judgment only '[w]here an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility.'" *Outlaw*, 259 F.3d at 838, *citing* Advisory Committee Notes, 1963 Amendment to Fed. R. Civ. P. 56(e)(other citations omitted).

Fed. Rule Civ. Pro. Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party there is no 'genuine' issue for trial." *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359 (7th Cir. 1988). A "metaphysical doubt" will not suffice. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586

(1986).  Disputed facts are material only if they might affect the outcome of the suit.  *First Ind. Bank v. Baker,* 957 F.2d 506, 507-08 (7th Cir. 1992).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, *247-248, 106 S.Ct. 2505, 2510 (1986).

## Background

The plaintiff claims that during the period May 2003 through October 2003, the defendants were deliberately indifferent to his serious medical needs.  He alleges that beginning on May 4, 2003, he started experiencing chest pains, shortness of breath and numbness in his arms.  After collapsing in the yard, he was taken to the Health Care Unit at Danville Correctional where he was provided medical treatment by Nurses Marilyn Sia and Barbara Roundtree.  The treatment included an electrocardiogram (EKG).  The nurses advised Collins that the EKG was normal and that there was nothing wrong with him.  One of the nurses spoke with Dr. Uzoaru, who ordered that the plaintiff be kept in the infirmary.  The plaintiff remained in the infirmary for two days.  On the second day, May 6, 2006, Dr. Uzoaru advised the plaintiff that he would get another evaluation later and ordered that the plaintiff be returned to his housing unit.

On May 9, 2003, the plaintiff returned to the Health Care Unit for a follow-up visit.  He had blood drawn for further tests. Dr. Uzoaru discussed the plaintiff's high blood pressure and high cholesterol level with him and advised the plaintiff to take "it easy."  On May 12, 2003, the plaintiff again experienced chest pain, shortness of breath and numbness in his arms.  He advised one of the correctional officers of his medical concerns.  The officer called the Health Care Unit.  The plaintiff was taken to the Health Care Unit on a stretcher.  The plaintiff was given another EKG and medical staff advised him that the readings were normal.  However, Dr. Uzoaru ordered the nurse to keep the plaintiff in the infirmary for one day.  On May 13, 2003, Dr. Uzoaru prescribed medication for the plaintiff's high blood pressure.  He advised the plaintiff that he did not know what was causing his symptoms and released the plaintiff back to his housing unit.

On May 14, 2003, the plaintiff again experienced chest pain, shortness of breath and numbness in his arms.  Nurses Paula Clauston and Barbara Roundtree provided medical care to the plaintiff.  Clauston spoke with Dr. Uzoaru over the phone.  Dr. Uzoaru ordered that the plaintiff be placed in the infirmary overnight.  The next day, Dr. Uzoaru examined the plaintiff by taking vital signs that included checking his blood pressure and listening to his lungs. He also ordered a stress test.

On May 29, 2003, the plaintiff was taken to an outside hospital, where a stress test was performed.  After the stress test, the plaintiff was returned to Danville Correctional Center.  Linda Davies, a nurse at Danville Correctional Center, advised the plaintiff that she would speak to the doctor about the results of the stress test, then released the plaintiff from the Health Care Unit back to his housing unit.  On May 30, 2003, the plaintiff again experienced chest pains, shortness of breath and numbness in his arms.  He was taken to the Health Care Unit where two nurses, George Gothias and Neale Aziark provided treatment that included a blood test.  They advised the

plaintiff that the test was normal. Dr. Uzoaru ordered that the plaintiff be returned to the housing unit because he had determined nothing was wrong with the plaintiff.

On October 17, 2003, the plaintiff had another medical episode. He was taken to a hospital in Danville, Illinois and then transferred to Provena Covenant Hospital in Urbana, Illinois. Provena prescribed and performed an angiogram. The angiogram demonstrated that the plaintiff required open heart surgery. The surgery was performed successfully at Provena, after which the plaintiff was returned to Danville Correctional Center. Dr. Uzoaru denies he was deliberately indifferent to Plaintiff's serious medical need.

## UNDISPUTED STATEMENT OF FACTS

1. Mr. Samuel Collins is an inmate at Danville Correctional Center.
2. Mr. Collins was an inmate at the Danville Correctional Center during the time frame alleged in Plaintiff's Complaint, May 4, 2003 through October 17, 2003 and January 10, 2004 through January 17, 2004.
3. During this time period, Mr. Collins was assessed by a number of caregivers, including but not limited to: Teri Irwin, Doris Armour, Barbara Roundtree, Paula Clawson, George Guidas, Neale Aziaka, Sharon Stark, and Dr. Uzoaru. See Co-Defendant's Motion for Summary Judgment [246].
4. Dr. Uzoaru was the medical director at the Danville Correctional Center from October, 1997 through November, 2003. See Exh. 1.
5. During his employment as the medical director at the Danville Correctional Center, Dr. Uzoaru saw an inmate by the name of Samuel Collins, Inmate No. B35214. See Exh. 1.
6. From May 4, 2003 through October 17, 2003, and January 10, 2004, through January 17, 2004 (the time frame alleged in Plaintiff's Complaint), Dr. Uzoaru saw and/or provided orders to the nursing staff regarding Mr. Collins on the following occasions: May 4, 2003, May 5, 2003, May 6, 2003, May 9, 2003, May 12, 2003, May 13, 2003, May 14, 2003, May 15, 2003, May 16, 2003, May 20, 2003, May 27, 2003, May 30, 2003, June 11, 2003, June 25, 2003, July 6, 2003, August 15, 2003, September 22, 2003, September 26, 2003, October 17, 2003. See Exhibit 1.
7. On May 4, 2003, Dr. Uzoaru was contacted by the nursing staff regarding Mr. Collins' complaints of chest pain. Dr. Uzoaru ordered ASA [Acetylsalicylic Acid/Aspirin] 325 mgs. II p.o. now and that Mr. Collins be placed in the infirmary for 23-hour observation. The nursing staff was also instructed to give Mr. Collins oxygen via nasal cannula. (See Exhibit 1-A).
8. On May 5, 2003, at 12:15, Dr. Uzoaru examined Mr. Collins and recorded the following: S. Brief history: 30 yo BM [year old black male] history of chest pain yesterday while playing basketball. Personal history of increased lipid ?DM.
    O. Physical Examination: A & O x3 neck ok chest - clear $S_1$ $S_2$ only Abd. benign
    A. Admitting Diagnosis: Angina? Diet: Regular Diet. FBS, FLP, CBC, Fasting Chem Pro. Frequency of Vital Signs: Q shift. Medication Orders: Ecotron 325 mgs. T po daily x 5 mths.
    See Exhibit 1-B.

3

9. Based upon his examination, Dr. Uzoaru found Mr. Collins was stable, was not in any acute distress, but continued to monitor and assess his condition for changes.
10. On May 6, 2003, Dr. Uzoaru prepared a Discharge Summary, which states as follows: Active Problems/Diagnosis: Chest Pain, work up for atherosclerosis.  Medications: Ecotrin [aspirin] 325 mgs. II po daily x 5 months Follow-Up: Await blood results.  See Exhibit 1-C.
11. Per his assessment, Dr. Uzoaru thought it was medically necessary to order blood tests for Mr. Collins based on his complaints of chest pain and atherosclerosis.  However Dr. Uzoaru also found that Mr. Collins was medically stable and therefore discharged him from the Health Care Unit.  See Exhibit 1.
12. Dr. Uzoaru next assessed Mr. Collins on May 9, 2003 at 10:00 a.m. in a follow-up visit. Per his note, he recorded the following:
    S. Increase lipids
    A. Increase lipids
    P. Lescol 2 p daily x 5. A Lescol 20 mg. p.o. dly x 5 mths. Repeat FLP 6 weeks.
    See Exhibit 1-D.
13. Lescol is used to reduce the amount of cholesterol and certain other fatty substances in the blood. See Exhibit 1.
14. On May 12, 2003, Dr. Uzoaru received a call from the nursing staff, who advised him that Mr. Collins was again complaining of chest pain. Per Dr. Uzoaru's orders, he was admitted to the infirmary for a 23-hour observation, with vitals to be checked every shift. He was also to be given a regular diet, Clonadine, 0.2 mg. p.o. one time only now.  See Exhibit 1-E.  Dr. Uzoaru prescribed Clonadine to treat Mr. Collins' high blood pressure. See Exhibit 1.
15. On May 13, 2003, Dr. Uzoaru personally assessed Mr. Collins while in the Health Care Unit. Per Dr. Uzoaru's medical note dated May 13, 2003, at 10:15:
    S. Came to HCU with  .   BP and chest pain. Pt has dyslipidemia.
    O. A & O x3. No chest pain. BP still elevated. I will start on Lopressor today and monitor BP.
    A. HTN [hypertension, high blood pressure], Angina
    P. Admit HTN clinic. Lopressor 50 mgs. po daily x 5 months.
    Check BP 2 times per week - x 4 weeks.  RTN 4 weeks. discharge to housing.
    See Exhibit 1-F.
16. Per his assessment, Dr. Uzoaru found Mr. Collins to be hypertensive, and prescribed Lopressor to treat Mr. Collins' high blood pressure and chest pain. See Exhibit 1.
17. On May 14, 2003, Mr. Collins was taken to the Health Care Unit for chest pain. According to Mr. Collins' medical records, Dr. Uzoaru assessed Mr. Collins in the ER and gave the following orders:  Admit to infirmary, regular diet, give Clonadine 0.2 mg. now 1 x only,  . Lopressor to 50 mg. bid x 5 mo. See Exhibit 1-G.
18. Dr. Uzoaru then assessed Mr. Collins this same date at 1530 and prepared the following progress note:
    S. Brief History: Chest pain in housing unit. No chest pain after being in first aid room.
    O. Physical Examination: A & O x3. No distress. Chest clear.

4

     S$_1$ S$_2$ only. Abd.benign.
     A.  Admitting Diagnosis: Chest pain. Diet: regular. Frequency of Vital Signs: q 4 hours  until BP  . to normal, then q shift.
     Medication orders: Lopressor 50 mg bid x 5 mo. Clonadine
     0.2 mg. now 1 x only.
  See Exhibit 1-H.

19. On May 15, 2003, Dr. Uzoaru assessed Mr. Collins and recorded the following:
     S. Had another episode of chest pain this morning.  Pain is gone now.
     O. No distress.
     A. Chest pain ? Angina.
     P. Imdur 30 mg T po daily x 5 mo. Echo on 5/19/03.
  (Imdur is prescribed to prevent angina attacks (chest pain).  See Exhibit 1-I.

20. On May 15, 2003, Dr. Uzoaru received a call from the nursing staff and advised them to hold Mr. Collins' Lopressor at 8:00 p.m. today. See Exhibit 1.

21. On May 16, 2003 at 1330, Dr. Uzoaru again assessed Mr. Collins. According to his medical record:
     S. No complaints, history of angina
     A. Angina Pectoris
     P. For stress Echo 5/19/2003.
  See Exhibit 1-K.

22. Later that day, Dr. Uzoaru was notified that Mr. Collins' blood pressure was at normal limits, and therefore, Dr. Uzoaru ordered the nursing staff to discontinue Mr. Collins' 8 p.m. dose of Lopressor. See Exhibit 1-L.

23. On May 19, 2003 per Dr. Uzoaru's orders, Mr. Collins was sent to a cardiac specialist at an outside facility to undergo a stress echo. Dr. Hanif performed the stress test. According to Dr. Hanif's report:
     1.  Good exercise capacity;
     2.  Normal hemodynamic response;
     3.  Negative test for any electrocardiographic evidence of ischemia but positive for shortness of breath.
     4.  No evidence of arrhythmias.
     5.  Normal LV cavity size and systolic function.
     6.  Negative stress echo as evident by an appropriate. hyperdynamic response for all segments of left ventricle without any regional wall motion abnormality. This test is negative for ischemia.
  See Exhibit 1-M.

24. As indicated by Dr. Hanif, Mr. Collins' stress test was negative for ischemia and arrhythmias. The only positive finding was shortness of breath. See Exhibit 1.

25. On May 20, 2003, Mr. Collins was discharged from the infirmary.  Dr. Uzoaru's Discharge Health Summary reads as follows:
     Active Problems/Diagnosis: Chest pains regular. For stress echo which was negative.
  See Exhibit 1-N.

26. On May 27, 2003, Dr. Uzoaru again assessed Mr. Collins. Per his medical note:

    S. History of angina & Rt.knee pain.
    O. Stress Echo normal. Explained results to patient.
    A. History of angina
    P. Knee pain
  See Exhibit 1-O.
27. On May 30, 2003, Dr. Uzoaru was again contacted by the Health Care Unit regarding Mr. Collins' complaints of chest pain with accompanying numbness and tingling in left arm and leg. Per the nurse's report, Dr. Uzoaru ordered the nurses to increase Mr. Collins' Lopressor to 50 mgs. by mouth two times daily and to return to the health care as needed. See Exhibit 1-P and 1-Q (coordinating order form).
28. Dr. Uzoaru's next assessments of Mr. Collins occurred on June 11, 2003, June 25, 2003, and August 15, 2003. He was also assessed by the nursing staff on July 6, 2003, and August 13, 2003. The examinations pertained to ear symptoms and facial and foot rashes. Mr. Collins did not voice any complaints of chest pain or shortness of breath during any of these four (4) examinations. See Exhibits 1-R, 1-S, 1-T, 1-U.
29. The next time Dr. Uzoaru was notified by the nursing staff regarding Mr. Collins' complaints of chest pain was on September 22, 2003. Per Dr. Uzoaru's orders, Mr. Collins was placed in Room C for observation. See Exhibit 1-V and 1-W. Mr. Collins' condition stabilized.
  See Exhibit 1.
30. On September 26, 2003, Dr. Uzoaru assessed Mr. Collins for complaints of chest pain. Per his progress note, Dr. Uzoaru recorded the following:
    S. 30 yo BM [year old black male] with chest pain and epigastric pain. Feels his food comes up sometimes 3 bowel movements a day. Pt. had a stress echo 5/03/03. I will see him for esophagitis, GERD, PUD or IBS.
    A. Esophageal pain.
    P. CTM 4 mgs. bid x week; Reglam 10 mg. Bid x 60; RTC 3 weeks; Lescol 2 mgs. p.o.dly x 5 mos.
  See Exhibit 1-X.
31. Based on his assessment, Dr. Uzoaru found Mr. Collins suffered from dyspepsia, which is pain or uncomfortable feeling in the upper middle part of one's stomach. See Exhibit 1.
32. On October 17, 2003, at approximately 1:37 a.m., the nursing staff responded to a code 3 for Mr. Collins' complaints of chest pain. The nursing staff contacted Dr. Uzoaru and he ordered the following: Ntg subl repeat to x 3 IV. 9 NS @150 cc. $0_2$ by non-rebreather, transfer to Provena USMC via ambulance for CP R/O MI. See Exhibit 1-Y. Mr. Collins' EKG went from sinus rhythm to bigeminy - - a heart condition malfunction. See Exh. 1.
33. On October 17, 2003, Mr. Collins' symptoms were consistent with a cardiac condition requiring outside care. See Exhibit 1.
34. At Provena Covenant Medical Center, Mr. Collins was diagnosed with coronary artery disease and acute myocardial infarction, and thus, underwent a quadruple coronary artery bypass. See Exhibit 1.
35. According to Mr. Collins' Discharge Summary from Provena Covenant Medical Center dated October 24, 2003, he had the following discharge diagnosis:
    1) CAD, status post-CABG;

       2) Recent MI;
       3) Hypertension;
       4) Hypercholesterolemia.
   See Exhibit 1-AA.

36. The October 17, 2003, incident was the first time Mr. Collins' condition reached an acute level that required further medical treatment by an outside facility. Prior to this incident, Mr. Collins' EKG readings did not indicate he was having a cardiac event. Mr. Collins' condition was always properly treated with medication, observation, and his condition was always stabilized. See Exhibit 1.
37. Dr. Uzoaru assessed Mr. Collins on several other occasions following his discharge from Provena USMC, but these assessments occur outside the time period alleged in Plaintiff's Complaint. (These assessments occurred on October 24, 2003, October 27, 2003, October 28, 2003, October 29, 2003, October 30, 2003, November 3, 2003, November 4, 2003, November 6, 2003, November 7, 2003, November 12, 2003, and November 13, 2003.) Dr. Uzoaru did not assess or evaluate Mr. Collins at anytime after November 13, 2003, in that Dr. Uzoaru was no longer working as the Medical Director at the Danville Correctional Center. See Exhibit 1.
38. Mr. Collins did not complain of any chest pains in between May 30, 2003, and September 22, 2003. Also, Mr. Collins did not make any complaints of chest pain in between September 26, 2003, and October 17, 2003. See Exhibit 1.
39. All of plaintiff's complaints presented to Dr. Uzoaru were addressed appropriately. See Exhibit 1.
40. At no time did Dr. Uzoaru feel Mr. Collins was at risk of substantial harm by remaining in the correctional center. See Exhibit 1.
41. Prior to October 17, 2003, Mr. Collins' symptoms, EKG results and clinical findings did not suggest that he suffered from a cardiac condition. See Exhibit 1.
42. Mr. Collins had a series of EKGs performed throughout his incarceration at Danville correctional Center beginning 1994. Dr. Uzoaru relied on earlier tests in interpreting the results from Mr. Collins' May 4, 2003; May 12, 2003; May 14, 2003; May 15, 2003; May 30, 2003; September 22, 2003, and September 24, 2003 EKGs. See Exhibit 1.
43. In Dr. Uzoaru's opinion, prior to October 17, 2003, plaintiff was suffering from HTN(hypertension/high blood pressure)/angina which was treated. See Exhibit 1.
44. On October 17, 2003, Dr. Uzoaru was not at the site when plaintiff presented with his complaints of chest pains. See Exhibit 1.
45. Plaintiff's description of his symptoms on October 17, 2003, was consistent with possible MI including EKG findings. Thus, Dr. Uzoaru ordered that plaintiff be transferred to the hospital and given medication consistent with my differential diagnosis. See Exhibit 1.
46. Plaintiff suffered no physical injury as a result of Dr. Uzoaru's care and treatment. See Exhibit 1.
47. Plaintiff's complaints prior to October 17, 2003, did not suggest that he was in need of bypass surgery. See Exhibit 1.
48. The physicians at Provena assessed and evaluated plaintiff as being in need of surgery to repair his condition. See Exhibit 1.
49. Dr. Uzoaru approved this recommendation and the follow-up care recommended and

        provided care until Dr. Uzoaru's departure date of November, 2003.  See Exhibit 1.
50.     Dr. Uzoaru's opinions expressed in this Motion For Summary Judgment are based upon his training, experience, education, his recollection and his review of portions of Mr. Collins' medical records, which are identified as Group Exhibit 1A-AA.  See Exhibit 1.

### Discussion and Conclusion

Absent evidence of deliberate indifference to the plaintiff's serious medical needs, summary judgment is appropriate.  In order to prove his cause of action, plaintiff must prove there was "deliberate indifference" to his serious medical needs.  At a minimum, this requires actual knowledge of impending harm which is easily preventable, so that a conscious capable refusal to prevent harm can be inferred from the defendant's failure to prevent it.  *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997); *Duckworth v. Franton*, 780 F.2d 645, 653 (7th Cir. 1985).  Deliberate indifference is more than mere negligence and approaches intentional wrongdoing.  *Farmer v. Brennan*, 511 U.S. 825, 835, 114 S.Ct. 1970 (1994).  In *Farmer*, the court concluded that deliberate indifference was essentially a criminal recklessness standard, that is, ignoring a known risk.  *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998). The deliberate indifference standard applies when prison medical personnel make decisions as to what medical care a person requires.  *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285 (1976); *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997).  Additionally, to prove deliberate indifference against a physician, a plaintiff must show two things:  1) that the doctor was aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists (objective standard), and 2) that the doctor actually drew that inference (subjective standard). *Wilson v. Seiter*, 501 U.S. 298, 300 (1991); *Higgins v.Correctional Medical Servs.*, 178 F.3d 508, 511 (7th Cir. 1999). A complaint that a physician has negligently diagnosed a medical condition does not state a cause of action for violation of the prisoner's constitutional rights. *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285 (1976).

It is not enough to simply assert that the doctor should have known of the risks.  *Higgins*, 178 F.2d at 511.  A physician's exercise of his professional judgment does not constitute deliberate indifference.  *Youngber v. Romeo*, 487 U.S. 307, 322-323 (1982).  Furthermore, a disagreement or dissatisfaction with the method treatment does not constitute an Eighth Amendment claim of deliberate indifference.  *Snipes v. DeTella*, 95 F.3d 586, 591-92 (7th Cir. 1996).   Medical decisions, such as whether one course of treatment is preferable to another, is beyond the purview of the Eighth Amendment.   Such matters are questions of tort, not constitutional law.  *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996).  The Constitution is not a medical code that mandates specific medical treatment.  *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996).  Further, inappropriate medical treatment based on pure negligence, or even a series of purely negligent acts is not the same as indifference to a serious medical need.  *Sellers v. Hennan*, 41 F.3d 1100, 1102-03 (7th Cir. 1994).  While a prisoner has the right to medical care he does not have the right to determine the type and scope of the medical care he personally desires.  *Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. Col. 1968).

A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give

rise to a constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition. *Johnson*, 433 F.3d 1001 (7th Cir. 2006); *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). Stated differently, inattention to a medical condition amounts to a constitutional violation only where the medical condition is serious. *Brownell v. Figel*, 950 F.2d 1285, 1289 (7th Cir. 1991). As previously indicated, deliberate indifference may only be found when an official knows of and disregards an excessive risk to an inmate's health or safety. *See Duane v. Lane*, 959 F.2d 673, 676 (7th Cir. 1992). Deliberate indifference also requires that defendant either intended to harm plaintiff or knew of a risk of harm so significant that an intent to harm could be inferred from a refusal to provide medical care. *See Smith-Bey v. Hosp. Administrator*, 841 F.2d 751, 759 (7th Cir. 1988).

Last, not every delay in treatment indicates that a prison official was deliberately indifferent to an inmate concerning a medical issue. *See Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997); *See also, Abdul-Wadood v. Nathan*, 91 F.3d 1023, 1025 (7th Cir. 1996). "Furthermore, '[a]n inmate who complains that delay in medical treatment rose to a Constitutional violation must place verifying medical evidence in the record to establish to detrimental effect of delay in medical treatment to succeed.' " *Langston v. Peters*, 100 F.3d 1235 (7th Cir. 1996), *quoting Beyerbach v. Sears*, 49 F.3d 1234, 1326 (8th Cir. 1995) (emphasis in original).

Plaintiff's allegations as to Dr. Uzoaru, Plaintiff alleges that on May 6, 2006, Dr. Uzoaru ordered that Plaintiff be kept in the infirmary and that on the next day, Dr. Uzoaru advised Mr. Collins that he would get another evaluation and then ordered Mr. Collins to be returned to his housing unit. Plaintiff also alleges that on May 9, 2003, Dr. Uzoaru discussed with Plaintiff his high blood pressure and high cholesterol level and advised him to take it easy. On May 12, 2003, Plaintiff was again taken to the Health Care Unit for his complaints of chest pain, shortness of breath, and numbness in his arms. He claims that Dr. Uzoaru ordered the nurses to keep him in the infirmary for one day. On the following day, Plaintiff claims that Dr. Uzoaru prescribed medication for the Plaintiff's high blood pressure, and that Dr. Uzoaru informed Mr. Collins that he did not know what was causing Mr. Collins' symptoms. Plaintiff alleges Dr. Uzoaru released the Plaintiff back to the housing unit. On May 14, 2003, Plaintiff alleges that he again experienced shortness of breath, chest pain, and numbness in his arms. Plaintiff alleges Dr. Uzoaru again ordered the Plaintiff to be placed in the infirmary over night. Dr. Uzoaru examined the Plaintiff by taking vital signs, which included taking his blood pressure and listening to his lungs. Dr. Uzoaru also ordered a stress test. On May 30, 2003, Plaintiff claims he was again experiencing chest pain, shortness of breath, and numbness in his arms. He was again taken to the Health Care Unit for evaluation. Plaintiff claims that Dr. Uzoaru ordered the Plaintiff to be returned to the housing unit because Dr. Uzoaru had determined that nothing was wrong with Collins. Finally, Plaintiff alleges that on October 17, 2003, he had another medical episode which resulted in him being transferred to Provena Covenant Medical Center in Urbana, Illinois. While at Provena, Collins underwent an angiogram and open heart surgery, which Plaintiff alleges was successful. As a result of these allegations, Plaintiff claims that Dr. Uzoaru was deliberately indifferent to his serious medical needs.

As outlined explicitly in Dr. Uzoaru's Affidavit, Dr. Uzoaru saw Mr. Collins approximately nineteen (19) times from May 4, 2003, through October 17, 2003. As further indicated, every time either the nursing staff contacted Dr. Uzoaru regarding Mr. Collins complaints of chest pain and shortness of breath, or whether he personally examined Mr. Collins for his complaints of chest pain and shortness of breath, Dr. Uzoaru either admitted Mr. Collins to the infirmary for a 23-hour observation, modified his medications, and/or ordered various lab work to assess Mr. Collins' condition. Every time Mr. Collins' medication was given and/or modified, his condition stabilized. On May 16, 2003, Dr. Uzoaru ordered that Mr. Collins undergo a stress test, which was to be performed by a cardiac specialist at an outside facility. This stress test revealed normal hyperdynamic response, no evidence of ischemia, but positive for shortness of breath, no evidence of arrhythmias, and normal size and systolic function of the LV cavity. As further noted in Dr. Uzoaru's Affidavit and Collins' medical records, Collins underwent a serious of EKGs every time Collins' complaints of chest pains or shortness of breath warranted it. Dr. Uzoaru not only relied on these EKG readings in comparison to previous EKGs, but also relied upon the findings of the stress test when recommending follow-up treatment plans for Collins.

It was not until October 17, 2003 when Mr. Collins' condition changed, and required further intervention by an outside facility. Upon receiving the information from the nursing staff on October 17, 2003, Dr. Uzoaru immediately gave the nurses orders and instructed them to contact Provena USMC. The nurses complied, and Collins was transported to an outside facility in a timely manner. In Dr. Uzoaru's opinion, Collins' EKG on October 17 went from sinus rhythm to bigeminy, which is a heart condition malfunction and these symptoms were consistent with a cardiac condition requiring outside care. In Dr. Uzoaru's opinion, the October 17, 2003, incident was the first time Collins' condition reached an acute level that required further medical treatment by an outside facility. Prior to this incident, Collins' EKG readings did not indicate he was having a cardiac event. Collins underwent a quadruple bypass while at Provena Covenant Medical Center, which Dr. Uzoaru thought was appropriate based on Mr. Collins' symptoms as he presented on October 17, 2003. Following Collins' discharge from Provena Covenant Medical Center, Dr. Uzoaru concurred with the recommended follow-up care and assessed Collins on almost a daily basis from October 24, 2003, to November 13, 2003, regarding his cardiac condition. While Dr. Uzoaru indicates that a heart condition can be a serious medical need if not properly treated, it is Dr. Uzoaru's medical opinion that Mr. Collins' condition was always properly treated with medication, observation, and his condition was always stabilized. Further, it is Dr. Uzoaru's opinion that at no time prior to October 17, 2003, did Mr. Collins' complaints suggest that he was in need of bypass surgery.

It is Plaintiff's burden to establish that he suffered from a serious medical need and that Dr. Uzoaru knew of this serious medical need and intentionally disregarded that serious medical need. The undisputed statement of facts and Dr. Uzoaru's sworn Affidavit clearly indicate that while Collins may have been suffering from chest pains, at no time did Dr. Uzoaru intentionally disregard Collins' condition. In fact, just the opposite is true. Dr. Uzoaru provided appropriate medical care at all times, and none of the medical care he provided placed Mr. Collins at risk of substantial harm. As indicated by Dr. Uzoaru, none of the medical care he provided caused

physical injury to Mr. Collins. For these reasons, this court finds that Plaintiff has failed to satisfy his burden and put forth any competent evidence that would indicate that Dr. Uzoaru was deliberately indifferent to a serious medical need. Accordingly, the court must grant summary judgment in favor of Dr. Uzoaru.

Further, an inmate may not recover mental or emotional damages in a Section 1983 claim absent a showing of physical injury. According to 42 U.S.C. Section 1997e(e), Limitation on recovery, "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without prior showing of physical injury. 42 U.S.C. §1997e. More specifically, an inmate may not recover for emotional or mental damages without first establishing that he suffered a specific physical injury. *Herman v. Horn*, 238 F.3d 523 (3rd Cir. 2003). Dr. Uzoaru does not dispute Plaintiff suffered an acute cardiac condition on October 17, 2003 that resulted in a quadruple bypass surgery. Dr. Uzoaru, however, does dispute that his alleged conduct caused or contributed to this incident. The court finds that the Plaintiff's attempts to recover emotional or mental damages fails as a matter of law.

**It is ordered:**

1. **Pursuant to Fed. R. Civ. Pro. Rule 56 (c), Dr. Ike Uzoaru's summary judgment motion [244] is granted. The clerk of the court is directed to enter judgment in favor of the Defendant, Dr. Uzoaru and against the plaintiff at the close of his case. The parties are to bear their own costs.**
2. **If the plaintiff wishes to appeal this decision, he may file a notice of appeal with this court within 30 days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If the plaintiff does choose to appeal, he will be liable for the $455.00 appellate filing fee irrespective of the outcome of the appeal. Furthermore, if the appeal is found to be non-meritorious, the plaintiff may also accumulate a strike under 28 U.S.C. 1915(g).**

**Enter this 19th day of September 2007.**


s\Harold A. Baker

_____
**Harold A. Baker
United States District Judge**